| | | |
|---|---|---|
| ROSA RAMIREZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| | ) | |
| LIBERTY LIFE ASSURANCE COMPANY | ) | |
| OF BOSTON and WELLS FARGO AND | ) | |
| COMPANY LONG TERM DISABILITY | ) | |
| PLAN | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**THIS MATTER** comes before the Court on the parties' cross motions for summary judgment, (Doc. Nos. 23, 25), and the parties' associated briefs and exhibits, (Doc. Nos. 24, 26, 28–32). Also before the Court is Liberty Life Assurance Company of Boston ("Liberty") and the Wells Fargo and Company Long Term Disability Plan's ("the Plan;" collectively, "Defendants"[1]) Motion to Strike, (Doc. No. 27), and the parties' associated briefs, (Doc. Nos. 32–33).

## I.    BACKGROUND

This is an Employee Retirement Income Security Act ("ERISA") case in which Rosa Ramirez ("Plaintiff") contends that Defendants wrongfully denied her long-term disability benefits ("LTD benefits"). Wells Fargo & Company ("Wells") hired Plaintiff as a Financial Crimes Specialist 2, a sedentary position, on May 26, 2015. (Doc. No.

---

[1] Defendant Wells Fargo and Company was voluntarily dismissed by stipulation of the parties as was the sole cause of action against Wells. (Doc. No. 11).

1

17: Administrative Record [hereinafter, cited as AR] at 47, 707–08).

## A. Onset of Plaintiff's Disability

After Plaintiff allegedly suffered a mental breakdown following an altercation with her manager at Wells, Plaintiff stopped working at Wells on August 27, 2015. (AR 342, 765). The following day, Plaintiff sought treatment with her primary care physician, Dr. Mary Gentry. (AR 621–20). Dr. Gentry referred Plaintiff to a psychiatrist for additional psychiatric care due to Plaintiff's complaint about "worsening depression and anxiety since starting a new job." (AR 612). Liberty approved Plaintiff's short-term disability claim in September 2015, with a disability date of August 27, 2015. (AR 766).

On December 2, 2015, Plaintiff had her first psychiatric assessment with Dr. George Robinette, who diagnosed Plaintiff with anxiety and major depressive order. (AR 724–30). He stated that, "[i]n my opinion, [Plaintiff] requires a higher level of care given the chronicity and severity of her mental illness." (AR 730). Accordingly, he referred her to Daymark Recovery Services ("Daymark"). (Id.). On December 22, 2015, Plaintiff had her initial assessment with Dr. Michael Arena at Daymark. (AR 292–94). Despite some improvement in January, Plaintiff regressed in February 2016, as Dr. Gentry noted that Plaintiff was "back to doing all of her errands and shopping in the middle of the night" and was having suicidal ideation. (AR 251). Dr. Gentry concluded that Plaintiff should stay out of work through March. (AR 254).

## B. Liberty's Long-Term Disability Determination

Plaintiff completed Liberty's claim forms to be potentially approved for long-term disability benefits ("LTD benefits") on February 23, 2016. (AR 501–13). On or about March 20, 2016, Dr. Karen Tie, an independent Board-Certified Psychiatrist, reviewed Plaintiff's medical records and spoke with several of Plaintiff's healthcare providers as part of Liberty's initial evaluation of Plaintiff's claim. (AR 351–57). Dr. Tie estimated that Plaintiff would experience impairments in her ability to "(1) respond appropriately to co-workers, supervisors and the general public (2) perform activities within a required schedule without unnecessary distractions from psychiatric impairments and (3) perform tasks when faced with the complexities of workplace conditions." (AR 352). Dr. Tie also concluded that Plaintiff's prognosis was "fair and return to work within the next month appear[ed] likely," adding that Plaintiff's return would be improved if claimant could work with a different supervisor. (AR 352). On March 22, 2016, Liberty approved Plaintiff's claim for LTD benefits, retroactive to February 25, 2016. (AR 342–44). Subsequently, Plaintiff continued to be treated at Daymark by Dr. Gentry.

During May 2016, Plaintiff's condition appears to have worsened. The record reflects that she experienced violent thoughts and acted abnormally.[2] On May 17, Liberty asked Dr. Tie to complete an addendum on Ramirez's file. (AR 56). On June 1, 2016, Mr. Yount—Plaintiff's treating psychotherapist—indicated to Dr. Tie that Plaintiff required weekly therapy but informed her that Daymark could not meet

---

[2] During this time period, Plaintiff also applied for Social Security Disability benefits. (AR 243). Her claim remained pending for the remainder of the administrative process of her LTD claim. (AR 105).

Plaintiff's needs and that he was considering referring Plaintiff to a different facility. (AR 172). On or about June 5, 2016, Dr. Tie reviewed Plaintiff's records and spoke with Plaintiff's treating providers. (AR 230–35). Dr. Tie's First Addendum to her initial report echoed her prior conclusions. Dr. Tie affirmed Plaintiff's diagnoses of Adjustment Disorder with mixed anxiety and depressed mood and Major Depressive Disorder, Bulimia Nervosa, and rule out diagnoses[3] of Generalized Anxiety Disorder and Social Anxiety Disorder. (AR 230). And she concluded that Plaintiff's "symptoms of depression, fatigue, low energy, tearfulness, lack of motivation, anxiety and poor sleep are of the severity to support impairment in occupational and social functioning." (Id.). Dr. Tie concluded that Plaintiff was restricted to "no more than Activities of Daily Living" through July 31, 2016, but that "[f]urther medical records from treating psychiatrist and psychotherapist would be important to review for ongoing psychiatric impairment beyond" July 31, 2016. (Id.).

On three separate occasions—June 15, June 29, and July 6, 2016—Plaintiff failed to attend therapy sessions. (AR 164–65, 171). On June 21, 2016, Plaintiff attended an individual therapy treatment with Mr. Yount, following a one-on-one session with her new psychiatrist, Dr. Tom Pak. (AR 168–70). Plaintiff complained to Dr. Pak that the prescribed amounts of medication caused sedation, but Dr. Pak did not reduce her dosage. (AR 169). Plaintiff told Dr. Pak that she was fearful of germs, and Dr. Pak noted that Plaintiff was wearing a jacket and gloves despite it

---

[3] A rule out diagnosis indicates that not all of the diagnostic criteria are confirmed, but further investigation is necessary before the diagnosis can be ruled out. See Battle v. Berryhill, 2018 U.S. Dist. LEXIS 34280, at *8 (E.D.N.C. Mar. 2, 2018).

being 90 degrees outside. (Id.).

During Plaintiff's one-on-one appointment with Dr. Pak on July 13, 2016, Dr. Pak noted that Plaintiff reported that she continues "to have some mild symptoms of depression and anxiety." (AR 164). She also reported to Dr. Pak that "recent news about police brutality has made her depression and anxiety worse." (AR 164). Dr. Pak kept her medication dosage the same, encouraged her to continue therapy at Daymark, and told her to return in two months. (Id.). After her individual session, Plaintiff stayed for group therapy. (Id.). On July 19, 2016, Plaintiff saw Dr. Gentry for a follow-up visit, and Dr. Gentry noted that there was no significant improvement in her energy level despite restarting compliance with her thyroid medication. (AR 186). On July 20, 2016, Plaintiff canceled her group therapy session because she was unable to pay her copay that week. (AR 162). On or about August 9, 2016, Dr. Gentry completed Liberty's restrictions form, confirming that Plaintiff was still restricted from working until released by her psychiatrist. (AR 183).

As part of Liberty's standard claims practices, Liberty retained G4S Compliance Investigations to conduct surveillance of Plaintiff on two occasions. (AR 211–24). On the first occasion, June 27, 2016, the surveillance sat outside of Plaintiff's residence all day but only observed Plaintiff leave her house to check the mail. (AR 214). On the second surveillance, July 1, 2016, Plaintiff was observed running errands with her boyfriend. (Id.). Liberty used these surveillance reports in its benefits determination.

On August 15, 2016, Liberty asked Dr. Tie to review Plaintiff's file yet again.

(AR 159–60). This was the third records review of Plaintiff's file within a five-month period. In the Second Addendum, dated August 28, 2016, Dr. Tie reviewed records from Dr. Gentry, Dr. Pak, and Mr. Yount from May 2016 through July 20, 2016. (AR 149–51). During this review, Dr. Tie did not speak with Dr. Pak and Mr. Yount— Plaintiff's treating providers—because Daymark's policy prevented the providers from speaking about Plaintiff's restrictions and limitations. (AR 151). Dr. Tie confirmed Plaintiff's diagnoses of Adjustment Disorder with mixed anxiety and depressed mood (as a reaction to stress at work), Major Depressive Disorder, rule out Generalized Anxiety Disorder, rule out Social Anxiety Disorder and Bulimia Nervosa. (AR 151). This time, however, Dr. Tie concluded that "[a]s of 7/13/16, the available medical records do not reasonably support that the claimant's symptoms are of the severity to support impairments, limitations or restrictions secondary to mental health conditions." (AR 149). She based this on updated medical records— particularly, Dr. Pak's treatment notes dated 7/13/16, which noted that Plaintiff was experiencing "some mild symptoms of depression and anxiety" but also that her concentration and memory were intact and her current medication seemed to be beneficial. (AR 151). "Therefore, the most recent available medical record dated 7/13/16 does not reasonably support impairing conditions such as significant sleep disturbance, anhedonia, amotivation, loss of appetite, significant decreased energy or significant problems with concentration resulting from mental health disorders." (Id.). In the Second Addendum, Dr. Tie noted Plaintiff's poor compliance with group psychotherapy appointments and reasoned that "a treatment plan which includes a

focus on improving resilience may be beneficial to the claimant and could therefore be considered by providers." (Id.).

Three days after receiving Dr. Tie's report, Liberty denied Plaintiff's claim on August 31, 2016, determining that Plaintiff was able to perform the duties of her Own Occupation based on Dr. Tie's August 28, 2016 Addendum. (AR 145–48). In the letter Plaintiff received denying her claim, Liberty stated that they reviewed various medical records and treatment notes from May 11 to July 20, 2016. (AR 146–47). The letter also referenced Dr. Tie's conversation with Denise Logan, the Center Director for Daymark. (AR 147). Ms. Logan informed Dr. Tie that, since May 1, 2016, Plaintiff had attended one psychotherapy session and two psychotherapy groups and had canceled all other appointments. (Id.).

### C. Plaintiff's Appeal

On September 29, 2016, Plaintiff appealed the denial of her claim with the assistance of legal counsel. (AR 143–44). When evaluating her appeal, Liberty considered two additional documents: (1) Dr. Gentry's Certification of Leave form sent to Liberty on September 21, 2016, (Doc. No. 26-1: Ex. A), and (2) a medical record from her treating psychiatrist, Dr. Keith Headen, dated September 22, 2016, (AR 140–42). The first form by Dr. Gentry detailed that Plaintiff suffered from serious health conditions of depression and anxiety with anhedonia, anger, irritability, insomnia, and suicidal ideation. (Doc. No. 26-1 at 4). It further noted that Plaintiff was on a continuous leave of absence and that her return to work date was undetermined. (Doc. No. 26-1 at 4).

Dr. Headen's notes chronicled that Plaintiff's "chief complaint [was], 'had conflict with supervisor and lead'" where she "felt that she was bullied and sabotaged" and "[e]ventually she was forced to quit." (AR 140). He noted that Plaintiff appeared downcast, was "over talkative," and near tears during their session. (Id.). He also noted that Plaintiff "tends to isolate herself, her anger is often explosive," "has violent dreams and sleeps poorly," "has made suicidal attempts," and "has a history of suicidal thoughts." (Id.). "She has encountered a number of therapists and psychiatrists but wasn't able to endure much treatment," and "[s]he was resistant to group therapy which was recommended." (Id.). Dr. Headen diagnosed Plaintiff with Bipolar Mood Disorder and Post Traumatic Stress Disorder ("PTSD") and noted that Plaintiff "has strong evidence of a character disorder which is a significant factor in the treatment approach and constitutes a co-morbid condition. (Id.). Dr. Headen assigned Plaintiff a GAF of 40, which he noted was the highest GAF in the past 12 months. (AR 141). Dr. Headen directed Plaintiff to continue current medications as prescribed, continue individual or group therapies if indicated, and to return for a follow-up appointment. (AR 141).

On October 12, 2016, Plaintiff submitted her statement to Liberty in support of her appeal, which recited the same arguments that her counsel made on September 29, 2016. (Compare AR 121–22, with AR 143–44):

> My therapist Stephen Yount was aware that I was not ready for group therapy. I was told that if I did not attend group therapy that I would have to find another psychiatrist and therapy. It was stated that I would no longer have one on one therapy. Also any paperwork would not be filled out for my LTD.
>
> I have a new psychiatrist, Dr. Keith Headen, stated that I was

not ready for group therapy due to my severe anxiety and deep depression. As far as using the evidence that I missed group psychotherapy appointments to deny her continued disability benefits, my new psychiatrist, Dr. Headen, can show that I was not ready and still [am] not ready for group therapy appointments. I feel mentally unstable being around groups. The new psychiatrist does have the ability to diagnose and fill out the necessary forms to show that I still need a treatment plan that will put me on track to perform duties necessary to go back to work.

(AR 121–22). Plaintiff's appeal requested that Liberty request additional medical records or forms from Dr. Headen, but Liberty refused to contact him and informed Plaintiff that she bore the onus of collecting any additional records.[4] (AR 51–52).

### D. Liberty's Review and Denial of Plaintiff's Appeal

Instead of asking Dr. Tie to review Dr. Headen's assessment, Liberty sent the claim to a disability nurse case manager ("DNCM") to conduct a file review on October 14, 2016. (AR 50). The DNCM conducted a "full file" review, including the materials Plaintiff submitted for appeal purposes. (Id.). The DNCM found an absence of medication adjustment or participation by Plaintiff in individual or group therapy, "which would not be expected if reported symptoms were of a severe and impairing nature." (Id.). Based on review of Plaintiff's file, the DNCM concluded that "there does not appear to be a worsening of symptoms," and that "the presence of depression or anxiety with medication or therapy would not in and of itself support the need for [restrictions and limitations]." (Id.). Rather, "the need for [restrictions and

_____

[4] Until this point, Liberty had regularly collected records from Daymark, Dr. Gentry, and Dr. Robinette. Dr. Tie, at Liberty's direction, had attempted to contact Plaintiff's treating providers in all three of her reviews. (AR 149–54, 230–35, 384–85).

limitations] would depend upon the presence of corroborating mental status findings such as psychomotor agitation or retardation, deficits in grooming or eye contact, deficits in cognition, thought disorder, memory, concentration intractable crying spells, or other such signs of functional impairment." (Id.). Additionally, she noted that "there is no indication [Plaintiff] is unable to care for self, family, or household or participate in social activities." (Id.). "Therefore, information received on appeal does not alter prior peer review." (Id.).

Based on the DNCM's findings, Liberty denied Plaintiff's appeal on November 14, 2016. (AR 109–11). The letter recited the DNCM's determinations and concluded that "the information does not contain mental status exam findings, diagnostic test results or other forms of medical documentation supporting [Plaintiff's] symptoms remained of such severity that they resulted in restrictions or limitations rendering [Plaintiff] unable to perform the duties of [her] occupation after that date." (AR 109). This letter also informed Plaintiff that she had exhausted her administrative right to review at that time, that no further review would be conducted by Liberty, and that her claim would remain closed. (AR 110).

On January 8, 2018, Plaintiff filed suit against Defendants alleging (1) that Defendants wrongfully denied her benefits under ERISA, in violation of 29 U.S.C. § 1132 and (2) that she is entitled to attorneys' fees and costs under ERISA § 502(g) and 29 U.S.C. § 1132(g). The parties' filed cross summary judgment motions on November 30, 2018, (Doc. Nos. 23, 25), and the Court held oral arguments on these motions on January 18, 2019. Having been full briefed and argued, the motions are

now ripe for adjudication.

## II.   LEGAL STANDARD

"ERISA actions are usually adjudicated on summary judgment rather than at trial." Vincent v. Lucent Techs., Inc., 733 F. Supp. 2d 729, 733–34 (W.D.N.C. 2010), aff'd, 440 F. App'x 227 (4th Cir. 2011).   Here, both parties have moved for summary judgment and agree this matter is ripe for summary adjudication.

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material only if it might affect the outcome of the suit under governing law.  Id.  The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  This "burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

Once this initial burden is met, the burden shifts to the nonmoving party, which "must set forth specific facts showing that there is a genuine issue for trial."

Anderson, 477 U.S. at 250.  The nonmoving party may not rely upon mere allegations or denials of allegations in the pleadings to defeat a motion for summary judgment, rather it must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party."  Id. at 248; accord Sylvia Dev. Corp. v. Calvert Cty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party.  Anderson, 477 U.S. at 255.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion.  Anderson, 477 U.S. at 248–49.  "If the evidence is merely colorable or is not significantly probative," summary judgment is appropriate.  Id. at 249–50 (citations omitted).

## III.  DISCUSSION

"ERISA is a 'comprehensive' and 'closely integrated regulatory system' that is 'designed to promote the interests of employees and their beneficiaries in employee benefit plans.'"  Gresham v. Lumbermen's Mut. Cas. Co., 404 F.3d 253, 257–58 (4th Cir. 2005) (quoting Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 137 (1990)).  A participant or beneficiary of a plan covered under ERISA may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms

of the plan." 29 U.S.C. § 1132(a)(1)(B).

## A. Standard of Review

"In reviewing the denial of benefits under an ERISA plan, a court's first task is to consider de novo whether the relevant plan documents confer discretionary authority on the plan administrator to make a benefits-eligibility determination." Woods v. Prudential Ins. Co. of Am., 528 F.3d 320, 321–22 (4th Cir. 2008) (quoting Blackshear v. Reliance Std. Life Ins. Co., 509 F.3d 634, 638 (4th Cir. 2007)). The Supreme Court established in Firestone Tire & Rubber Company v. Bruch, 489 U.S. 101 (1989), "that the default standard of review is de novo, and that an abuse-of-discretion review is appropriate only when discretion is vested in the plan administrator." Id. at 322 (discussing Firestone).

In the instant case, the language at issue is the following: "Liberty shall possess the authority to construe the terms of this policy and to determine benefit eligibility hereunder." (Doc. No. 16-4: Subject Plan at 39). The parties dispute the appropriate standard of review. The Court need not resolve this dispute because even under an abuse-of-discretion standard, Plaintiff prevails. See Wilkinson v. Sun Life & Health Ins. Co., 674 Fed. Appx. 294 (4th Cir. 2017) (declining to determine applicable standard of review because plaintiff would win under abuse-of-discretion standard). Accordingly, the Court proceeds under the abuse-of-discretion framework.

Under the abuse of discretion standard, the decision of a plan administrator will be upheld if the decision is reasonable, even if the Court would have reached a contrary conclusion upon an independent review. Id. at 299. A decision is reasonable

when the decision is "the result of a deliberate, principled reasoning process, and is supported by substantial evidence." Helton v. AT&T Inc., 790 F.3d 343, 351 (4th Cir. 2013) (internal citations omitted). "Substantial evidence" is defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." Carroll v. Eaton Corp. Long Term Disability Plan, 2017 U.S. Dist. LEXIS 63689, at *18 (D.S.C. Mar. 15, 2017) (quoting LeFebre v. Westinghouse Elec. Corp., 747 F.2d 197, 208 (4th Cir. 1984)), overruled by implication, on other grounds by, Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003)). "In evaluating whether a plan administrator abused its discretion, this circuit has identified the following eight nonexclusive 'Booth factors:'"

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Wilkinson, 674 F. App'x at 299 (quoting Booth v. Wal-Mart Stores, Inc. Assocs. Health and Welfare Plan, 201 F.3d 335, 342–43 (4th Cir. 2000).

**B. The substantial weight of the evidence points to Plaintiff being disabled under the terms of the Policy.**

Six of the eight Booth factors weigh in Plaintiff's favor.

1. Language and Purpose of the Plan

The first and second Booth factors weigh in Plaintiff's favor. Under the

terms of the Plan, once Liberty determines that someone is disabled, Liberty must continue to pay benefits if they receive continued proof of "(1) Disability; (2) Regular Attendance of a Physician; and (3) Appropriate Available Treatment." (AR 23). "Proof," as used in the Plan, is defined as "evidence in support of a claim for benefits" and can include a claimant's completed claim form, an attending physician's statement, a physician's diagnosis, chart notes and other forms of evidence. (AR 15). "In determining whether the Covered Person is Disabled, Liberty will not consider employment factors, including, but not limited to, interpersonal conflict in the workplace, recession, job obsolescence, paycuts, job sharing and loss of a professional or occupational license or certification." (AR 23–24).

This caveat is important. Defendants argue throughout their briefs that Plaintiff's reason for quitting her job was due to conflict with her supervisor—not because of a "disability" as defined in the Plan. Plaintiff relayed her workplace conflict to her treating physicians, and many of them memorialized Plaintiff's work-environment complaints in their treatment notes. (See Doc. No. 24 at 9–11, compiling list of instances where Plaintiff complained about her work environment and relationship with supervisor). Liberty argues that its denial determination was reasoned and principled because Plaintiff's real reason for quitting was because she was unhappy at work. However, multiple treating providers diagnosed and documented her symptoms of Anxiety and Major Depressive Disorder, and Dr. Headen later diagnosed and documented her symptoms of Bipolar Disorder and PTSD and noted that Plaintiff also has strong evidence of Character Disorder.

Thus, if Liberty based its disability determination upon Plaintiff's alleged attribution of her leave of absence to her supervisor's treatment, Liberty expressly violated Plan provisions. And if so, Liberty's decision was not reasoned and principled, which would tilt the fifth <u>Booth</u> factor in Plaintiff's favor.

Under the Plan's terms, "Disability" or "Disabled" means that (1) "during the Elimination Period and the next 24 months of Disability the Covered Person, as result of Injury or Sickness,[5] is unable to perform the Material and Substantial Duties of his Own Occupation" and (2) "thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation." (AR 9). "Material and Substantial Duties" mean "responsibilities that are normally required to perform the Covered Person's Own Occupation,[6] or any other occupation, and cannot be reasonably eliminated or modified." (AR 12). According to the Plan's terms, a Covered Person's Monthly Benefit will cease on "the date the Covered Person is no longer Disabled according to this policy[.]" (AR 32).

Liberty approved Plaintiff for LTD benefits on March 22, 2016, retroactive to February 25, 2016. (AR 342–44). Plaintiff continued to submit proof of her disability to Liberty by completing Liberty's claim form and submitting medical records that demonstrated that she regularly treated with a physician, that she was diagnosed by a medical doctor and a psychiatrist with disabling conditions, and that she received

---

[5] "Sickness" means "illness, disease, pregnancy or complications of pregnancy." (AR 17).
[6] "Own Occupation" means "the Covered Person's occupation that he was performing when his Disability or Partial Disability began." (AR. 14).

available, appropriate treatment. (See, e.g., AR 164 (Dr. Pak notes Plaintiff reports symptoms are worse on 7/13/16); 183 (Dr. Gentry reaffirms diagnoses on 8/09/16); AR 128–30 (Dr. Headen diagnoses Plaintiff with Bipolar Mood Disorder and PTSD, notes strong evidence of a Character Disorder "which is a significant factor in the treatment approach," and assigns Plaintiff a GAF of 40 on 9/22/16); AR 116–17 (Plaintiff informs Liberty she is treating with a new psychiatrist on 10/12/16); AR 151 (Liberty's doctor confirms Plaintiff's treatment is appropriate)). Despite Plaintiff's submission of continued proof of her disability, Liberty denied her LTD benefits on August 31, 2016 and upheld that denial on appeal on November 14, 2016. (AR 145–48, 108–10). And in doing so, Liberty violated the express language and purpose of the Plan.

> 2. The Adequacy of the Materials Considered to Make the Decision and the Degree to Which they Support it

The third Booth factor also weighs in Plaintiff's favor. Boiled down, Liberty seems to have relied on three principal grounds for denying Plaintiff's LTD benefits: (1) Dr. Pak's treatment notes dated 7/13/16, which described Plaintiff's symptoms as "mild," as well as the non-treating, file reviewers' assessments that Plaintiff's medical records demonstrated an absence of corroborating mental status findings or evidence that Plaintiff has an inability to care for self, family, or household or to participate in social activities; (2) Plaintiff's lack of attendance at scheduled therapy sessions, and (3) the absence of medication adjustment for Plaintiff. Denying benefits upon these grounds was not reasonable, and the substantial weight of the evidence points to Plaintiff being disabled during the relevant timeframe.

> a. Plaintiff's Medical Records

First, in its initial LTD denial letter to Plaintiff on August 31, 2016, Liberty identified 07/13/16 as the date that "the available medical records do not reasonably support that [Plaintiff's] symptoms are of the severity to support impairments, limitations or restrictions secondary to mental health conditions." (AR 147). The medical records from this date were the records made by Dr. Pak when Plaintiff presented for individual treatment. Liberty found that because Dr. Pak described Plaintiff's symptoms of depression and anxiety as "mild," her concentration and memory as "intact," her speech as "normal," and her thought process as "linear," as well as noted that she had "[n]o suicidal or homicidal thoughts [and] no auditory or visual hallucinations or delusions" on this date, Plaintiff was no longer disabled and was able to perform the material and substantial duties of her own occupation. (AR 151). However, Liberty improperly extrapolated these findings to support its nondisabled conclusion without giving equal credence to the other conclusions included in Plaintiff's file. Absent from the denial letter is the fact that, on this same date, Dr. Pak noted that Plaintiff reported her depression and anxiety had become worse and reaffirmed her psychiatric diagnoses of Generalized Anxiety Disorder, Rule out Social Anxiety Disorder, Bulimia Nervosa, and Rule out OCD. (AR 164). Additionally, Dr. Pak encouraged her to continue therapy at Daymark. (Id.). Dr. Pak never stated that Plaintiff's mental health was improving, nor did he conclude that Plaintiff was able to return to work at that time. Indeed, just six days later, Dr. Gentry noted that Plaintiff had had no significant improvement in her energy level, despite restarting compliance with thyroid medications. (AR 186). Although Liberty

claimed that it considered medical records from May 11, 2016 through July 20, 2016, the great weight of evidence during these dates shows that Dr. Pak's finding characterizing Plaintiff's symptoms as mild on 7/13/16 was the outlier.

Liberty failed to give proper weight to Plaintiff's medical records—the majority of which (1) documented Plaintiff's disabling diagnoses of depression, anxiety, and other mental disorders[7] and (2) demonstrated her inability to appropriately interact with others and inability to work in her own occupation. For example, the record reflects that in May 2016, Plaintiff's symptoms worsened. Treatment notes indicate Plaintiff having violent and suicidal thoughts and acting abnormally during May 2016. On May 11, 2016, Plaintiff showed up at Daymark twice without an appointment. (AR 177–78). She had witnessed a driver hitting a kitten in a Walmart parking lot and a Walmart employee subsequently throwing the kitten in the garbage dump. (AR 177). Plaintiff retrieved the dead kitten from the garbage and put it in a plastic bag, drove to Daymark with the dead kitten in her vehicle, and insisted—tearfully and loudly—that a Daymark clinician come see the kitten in the back of her vehicle. (Id.). Daymark also dispatched a mobile crisis unit to Plaintiff during May. (AR 176). During June 2016, Dr. Tie echoed her prior conclusions, noting that Plaintiff would experience the same work impairments in her ability to "(1) respond appropriately to co-workers, supervisors and the general public (2) perform activities

---

[7] Plaintiff was diagnosed with Bipolar disorder and PTSD a couple weeks after Liberty's initial denial of her claim, which was prior to the time Plaintiff appealed the denial of her LTD benefits. Therefore, evidence of Plaintiff's Bipolar Disorder, PTSD, and Character Disorder was before Liberty when it considered Plaintiff's appeal.

within a required schedule without unnecessary distractions from psychiatric impairments and (3) perform tasks when faced with the complexities of workplace conditions." (AR 230). Dr. Tie also concluded that the "[m]edical records document impairment in social functioning . . . [and] support marked psychiatric impairment with restrictions of no more than Activities of Daily Living until 8/1/16. Further medical records from treating psychiatrist and psychotherapist would be important to review for ongoing psychiatric impairment beyond 07/31/16." (Id.). And Plaintiff continued to act abnormally after this date—on June 21, 2016, Dr. Pak noted that Plaintiff wore gloves and a jacket despite the temperature being 90 degrees outside. (AR 169). On this date, Plaintiff also complained that her medication was causing her sedation, but Dr. Pak did not adjust her medication dosage, presumably because he believed the current dosage was necessary to treat Plaintiff's symptoms. (Id.).

On August 9, 2016, Dr. Gentry reaffirmed Plaintiff's disability. (AR 183). On September 22, 2016, Dr. Headen assigned Plaintiff a GAF of 40, opining that it was the highest score she had received in the prior twelve months. (AR 141). A GAF score of 40 is assigned when the provider recognizes

> [s]ome impairment in reality testing or communication (*e.g.,* speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.*, depressed man avoids friends, neglects family, and is unable to work…).

DSM-IV-TR, p. 34, Exhibit X; see also Zhou v. Metro Life Ins. Co., 807 F. Supp. 2d 458, 463 n.3 (D. Md. 2011) ("The GAF Score is used to report the clinician's judgment of an individual's functioning. A score below 50 shows a serious impairment in functioning."). Plaintiff's GAF score of 40 contradicts Liberty's conclusion that

Plaintiff's file was devoid of corroborating mental status findings signifying functional impairment or inability to care for self, others, and household and participate in social activities.

Instead of considering the impact of this score given by Dr. Headen—Plaintiff's treating psychiatrist who examined and treated Plaintiff in-person—Liberty relied on the assessment of non-examining reviewers who concluded that Plaintiff did not have impairments that would prevent her from performing the substantial and material duties of her job. First, Liberty relied on Dr. Tie to conduct three separate reviews of Plaintiff's file.[8] Then, during the appeal process, Liberty relied on a non-examining disability nurse case manager ("DNCM")[9] to review Plaintiff's file. (AR 108–10). While courts are not allowed to require administrators to automatically accord special weight to the opinions of a claimant's physicians in ERISA cases, Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (U.S. 2003), courts have reprimanded claims administrators for relying primarily on record-reviewing doctors without giving equal credence to treating physician's opinions or claimants' subjective complaints, especially in instances where the claimant suffers from a mental illness.[10]

---

[8] Dr. Headen's GAF assessment did not occur until after Dr. Tie's reviews of Plaintiff's file. But, by the time the DNCM reviewed Plaintiff's file, Plaintiff's file included Dr. Headen's assignment of a GAF score of 40.

[9] The fact that Liberty did not ask Dr. Tie to review Plaintiff's file during the appeals process is peculiar given her prior experience and knowledge regarding Plaintiff's case.

[10] See, e.g., Zhou, 807 F. Supp. 2d at 473–74 ("Because depression is a disease that encompasses inherently subjective complaints, it was inappropriate for MetLife to continually deny Plaintiff's claim based solely on the opinions of psychiatrists who merely reviewed Plaintiff's file, to the exclusion of statements and diagnoses by Plaintiff's treating physicians, and without an independent medical examination

Here, rather than having an independent board-certified psychiatrist review Dr. Headen's assignment of a GAF score of 40, Liberty chose to use a file-reviewing nurse to assess Plaintiff's file on appeal. Additionally, the DNCM did not even address Dr. Headen's GAF assessment in her review notes sent to Liberty. (See AR 50).

"Plan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Black & Decker Disability Plan, 538 U.S. at 834. Moreover, it appears that the reviewing DNCM did not even attempt to contact Dr. Headen, despite Plaintiff's express request to Liberty to do so. The Fourth Circuit has previously held that a claims administrator failed to meet its statutory and plan obligations to a claimant—implicating the sixth Booth factor—by failing to contact the claimant's treating psychologist "when it was on notice that [the claimant] was seeking treatment for mental health conditions and

---

supporting the view of MetLife's psychiatrists."). Accord, Gorski v. ITT Long Term Disab. Plan for Salaried Employees, 314 Fed. Appx. 540, 547 (4th Cir. 2008) (criticizing claims administrator for relying on opinion of non-examining doctor who discounted claimant's subjective complaints of pain without explaining why claimant was not credible); Neumann v. Prudential Ins. Co. of America, 367 F. Supp.2d 969, 990 (E.D. Va. 2005) (footnote omitted) ("The opinions of [claimant's physicians] are more persuasive not because they are treating physicians—indeed not all are—but because each physically examined and interviewed plaintiff."). "In the context of a psychiatric disability determination, it is arbitrary and capricious to rely on the opinion of a non-treating, non-examining doctor because the inherent subjectivity of a psychiatric diagnosis requires the physician rendering the diagnosis to personally observe the claimant. Because a psychiatric opinion that is based solely on a review of medical records is inherently less reliable than an opinion based on a face-to-face examination, it is an abuse of discretion to rely solely on such opinions, particularly in a case such as this, where the opinion of every physician who actually examined the plaintiff agreed that the plaintiff is disabled." Westphal v. Eastman Kodak Co., 2006 U.S. Dist. LEXIS 41494, at *12-13 (W.D.N.Y. 2006).

when it had his contact information." Harrison v. Wells Fargo Bank, N.A., 773 F.3d 15, 20 (4th Cir. 2014). Particularly because the denial cited the absence of information as the basis for denial (as Liberty did here), the Fourth Circuit held that the administration of the plan "cannot satisfy ERISA's full and fair review requirements." Id. at 23. "Once a plan administrator is on notice that readily-available evidence exists that might confirm claimant's theory of disability, it cannot shut its eyes to such evidence where there is little in the record to suggest the claim deficient." Id. at 24. In her appeal letter, Plaintiff informed Liberty that she was treating with a new psychiatrist, Dr. Headen, and requested that Liberty contact him for updated medical information regarding Plaintiff. (AR 121). Therefore, the sixth Booth factor weighs in Plaintiff's favor as well.

b. Plaintiff's Absences from Therapy

Next, Liberty found Plaintiff's absences from scheduled therapy sessions instructive in making its ultimate benefits determination. Liberty's denial letter referenced Dr. Tie's finding that Plaintiff "had poor compliance with the group psychotherapy appointments" and that Daymark informed Dr. Tie that "since 6/1/16, [Plaintiff] ha[d] attended one individual psychotherapy session and two psychotherapy groups and ha[d] cancelled all other appointments." (AR 147). And on appeal, Liberty again referenced Plaintiff's lack of attendance and participation in individual or group therapy, which it claimed would not be expected if Plaintiff's symptoms were of the severity and intensity that she alleged. (AR 109). However, a hallmark of bipolar disorder is lack of compliance with therapy treatment. Fitts v.

Unum Life Ins. Co. of Am., 2007 WL 1334974, at *2, 7–8 (D.D.C. May 7, 2007) (citing testimony from "one of the world's leading authorities on bipolar disorder" that "half of those diagnosed with bipolar disorder do not respond to treatment"); Reid v. Aetna Life Ins. Co., 393 F. Supp. 2d 256, 265 (S.D.N.Y. 2005) (acknowledging that depression can contribute to a plaintiff's "apparent inability to take medication regularly or remain on a course of treatment"). Here, multiple treating physicians acknowledged that Plaintiff had difficulty attending group therapy sessions due to her anxiety, which was especially triggered when she had to interact with other people. (See, e.g., AR 140).

Relatedly, in their briefs, Defendants point to the fact that, on July 1, 2016, Plaintiff ran errands with her boyfriend even though she had previously told treating providers that her anxiety prevented her from leaving the house during daytime hours. They point to the fact that, two weeks earlier, on June 15, 2016, Plaintiff cancelled her individual therapy appointment because she allegedly could not leave the house. (AR 171). Similarly, on June 29 and July 6, 2016, Plaintiff missed her scheduled appointments with Mr. Yount, Plaintiff's treating psychotherapist at Daymark. (AR 167). Defendants deflect attention from the fact that, on the first surveillance occasion on June 28, 2016, the surveillant camped out in front of Plaintiff's house all day and only witnessed her emerge from the house to check her mail. (AR 214). This alone—that on one surveillance occasion, Plaintiff hardly emerged from her house, and on the second surveillance occasion, Plaintiff ran errands and conversed and laughed with her boyfriend—suggests Plaintiff

suffers from bipolar disorder and major depressive disorder.[11]  "One feature—

perhaps the hallmark—of bipolar disorder is that it is 'episodic.'"  Demeo v. Colvin,

2015 WL 5768953, at *6 (D. Mass. 2015) (quoting Kangail v. Barnhart, 454 F.3d

627, 629 (7th Cir. 2006)).  Its victims tend to vacillate between experiencing high

highs and low lows.  See Bauer v. Astrue, 532 F.3d 606, 609 (7th Cir. 2008) (noting

that claimants with bipolar disorder are "likely to have better days and worse

days").  Liberty did not properly consider the nature of Plaintiff's disability—its

causes, side effects, and common traits—in making its LTD denial determination:

> The very nature of bipolar disorder is that people with the disease
> experience fluctuations in their symptoms, so that any single notation
> by a provider that a patient is feeling better or has had a "good day"
> does not imply that the condition has been treated.  Accordingly, where
> the claimant has a severe impairment of bipolar disorder, the ALJ
> must not simply "cherry-pick" the files of treating physicians to find
> evidence of good results among evidence of symptoms.  Likewise, a
> treating source opinion that a claimant with bipolar disorder is "stable"
> must be viewed in context. An observation, for instance, that claimant
> is "stable in the office" is not the same as an observation of "stability"
> as to [claimant's] ongoing bipolar disorder.

Walsh v. Astrue, 2012 WL 941781, at *4 (D.N.H. Mar. 20, 2012) (citations, footnote,

and internal punctuation omitted).  Although Walsh v. Astrue was decided in the

context of social security benefits, the analogy is apt.  Under ERISA, a plan

administrator is charged with a duty to act as a covered employee's fiduciary, with

an "eye single" to the employee's interests.  DiFelice v. U.S. Airways, Inc., 497 F.3d

---

[11] "Medically speaking, a diagnosis of bipolar disorder is inclusive of the symptoms
of major depressive disorder."  Bryant v. Colvin, 571 F. App'x 186, 188 (4th Cir.
2014).

410, 418–19 (4th Cir. 2007). As such, it cannot cherry-pick the best evidence in an employee's file to support its desired conclusion, which is what Liberty appears to have done here. Liberty used isolated incidents to buttress its conclusion that benefits should be denied to Plaintiff. Plaintiff's lack of compliance with prescribed therapy and her ability to run errands with her boyfriend during a three-hour span are not inconsistent with her diagnoses of various mental illnesses. Therefore, Liberty breached its fiduciary duty to act with an "eye single" to Plaintiff's interests when it engaged in impermissible cherry-picking.

### c. The Absence of Medication Adjustment

Liberty's third justification—that Plaintiff's medication dosage was not adjusted—was also an insufficient basis to alter its LTD-benefits-award determination. The fact that Plaintiff's medication was not adjusted does not indicate that her symptoms had improved. On the contrary, the fact that Dr. Tak and Dr. Headen did not adjust her dosage level, despite Plaintiff's complaints of suffering sedative side effects from the medicine, demonstrates that the doctors thought the current dosage amount was still necessary to treat Plaintiff's symptoms. Additionally, nowhere in the Plan does Liberty state that the absence of medication adjustment is grounds for termination of disability benefits.

In sum, Liberty's actions contravened the purpose of the Plan to provide compensation for covered employees who are disabled. "ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." Black & Decker Disability Plan v.

Nord, 538 U.S. 822, 830 (2003) (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113 (1989)). "The Act furthers these aims in part by regulating the manner in which plans process benefit claims." (Id.). Under ERISA, fiduciaries are charged with acting in the best interest of the Plan participants. "ERISA does not envision that the claims process will mirror an adversarial proceeding where 'the [claimant] bear[s] almost all of the responsibility for compiling the record, and the [fiduciary] bears little or no responsibility to seek clarification when the evidence suggests the possibility of a legitimate claim.'" Harrison v. Wells Fargo Bank, N.A., 773 F.3d 15, 21 (4th Cir. 2014) (quoting Gaither v. Aetna Life Ins. Co., 394 F.3d 792, 807 (10th Cir. 2004)). Because Liberty ignored the language and purpose of the Plan, and instead acted as Plaintiff's adversary, Liberty abused its discretion.

3. Liberty has a significant conflict of interest.

The last Booth factor also weighs in Plaintiff's favor. Because Liberty both evaluates and pays claims under the Plan, it has a structural conflict of interest. The conflict of interest "can be of great importance 'where circumstances suggest a higher likelihood that it affected the benefits decision.'" Montero v. Bank of Am. Long-Term Disability Plan, 2016 WL 7444957, at *6 (W.D.N.C. Dec. 27, 2016) (quoting Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 117 (2008)). The conflict at issue is analogous to the relevant conflict in Montero v. Bank of America Long-Term Disability Plan.

In Montero, the claims administrator "was responsible for deciding whether benefits should be paid and paying those benefits"—identical to Liberty's role here.

Id. The claims administrator encouraged the claimant in <u>Montero</u> to apply for Social Security benefits and offered to pay a third party to represent her. Id. The Court noted that the claims administrator had a clear economic benefit for doing so because any Social Security benefits awarded to the plaintiff would offset what the claims administrator owed. Id. Like the case at hand, despite the defendant discontinuing the plaintiff's LTD benefits, the defendant still instructed the attorney to proceed with representation, "which could result in [the claim administrator] receiving back payment for disability benefits already paid to [the] [p]laintiff." Id. The Court identified that the defendant took contradictory positions regarding the claimant's disability claims: the defendant told the plaintiff that the evidence she submitted did not support a finding of disability while simultaneously encouraging the plaintiff's attorney to argue to the Social Security Administration that the plaintiff demonstrated classic signs of her alleged disability. Id.

Here too, the sequence of events is telling. Liberty hired Doherty, a law firm, to represent Plaintiff in appealing the denial of her Social Security claim on August 10, 2016. Yet twenty-one days later on August 31, 2016, Liberty denied Plaintiff her LTD benefits, stating that "[a]s of 7/13/16, the medical records do not reasonably support that the claimant's symptoms are of the severity to support impairments, limitations or restrictions secondary to mental health conditions" and that "[b]ased on the medical information in relation to [the claimant's] occupation requirements, [the claimant] [is] able to perform the duties of [her] Own Occupation." (AR 147). And on November 14, 2016, Liberty upheld the denial of Plaintiff's LTD benefits on

appeal. (AR 108–10). Nevertheless, Liberty continued to pay for and provide representation for Plaintiff to argue that she was disabled before the Social Security Administration.

In sum, six of the eight <u>Booth</u> factors weigh in Plaintiff's favor, warranting a decision from this Court that Defendants abused their discretion in denying Plaintiff's LTD benefits. Accordingly, the Court grants summary judgment in Plaintiff's favor.[12]

## C. Plaintiff's Remedy

### 1. <u>Reinstatement of LTD Benefits</u>

Having determined that Defendants abused their discretion in denying Plaintiff LTD benefits, "the Court must [now] decide what the appropriate remedy is—whether to remand to the administrator or directly grant benefits." <u>Montero</u>, 2016 WL 7444957, at *6. The Fourth Circuit has indicated that "remand should be used sparingly." <u>Berry v. Ciba-Geigy Corp.</u>, 761 F.2d 1003, 1008 (4th Cir. 1985). "Where a court believes that an administrator lacked adequate evidence in making its determination, the appropriate remedy is to remand the case to the administrator." <u>Sapp v. Liberty Life Assurance Co. of Bos.</u>, 210 F. Supp. 3d 846, 855 (E.D. Va. 2016) (citing <u>Berry v. Ciba–Geigy Corp.</u>, 761 F.2d 1003, 1007 (4th Cir. 1985)). "Remand is most appropriate 'where the plan itself commits the trustees to consider relevant information which they failed to consider or where [the] decision

---

[12] Because the Court's decision is adequately supported by the Administrative Record alone, the Court need not resolve Defendants' Motion to Strike Exhibits C and D to Plaintiff's Memorandum in Support of her Motion for Summary Judgment, (Doc. No. 27).

involves records that were readily available and records that trustees had agreed that they would verify.'" Elliott v. Sara Lee Corp., 190 F.3d 601, 609 (4th Cir. 1999) (quoting Berry, 761 F.2d at 1008). "The district court may also exercise its discretion to remand a claim 'where there are multiple issues and little evidentiary record to review.'" Id. (quoting Quesinberry v. Life Insurance Co. of North America, 987 F.2d 1017, 1025 n.6 (4th Cir. 1993) (en banc)).

On the other hand, "remand is not required, particularly in cases in which evidence shows that the administrator abused its discretion." Helton v. AT&T Inc., 709 F.3d 343, 360 (4th Cir. 2013). "If the evidence in the record clearly shows that the claimant is entitled to benefits, an order awarding such benefits is appropriate." Gorski v. ITT Long Term Disability Plan for Salaried Employees, 314 Fed. Appx. 540, 548 (4th Cir. 2008) (quoting Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co., 491 F.3d 1180, 1194 (10th Cir. 2007)). The district court need not remand when it "would prove to be a 'useless formality.'" Sapp v. Liberty Life Assurance Co. of Bos., 210 F. Supp. 3d 846, 856 (E.D. Va. 2016) (quoting Miller v. United Welfare Fund, 72 F.3d 1066, 1074–75 (2d Cir. 1995) (Calabresi, J., concurring in part, dissenting in part)). Additionally, if there is evidence showing that a defendant "made its decision in a manner demonstrating that its conflict of interest likely influenced its decisionmaking process and conclusions," then that consideration weighs against remand. Coleman v. Metropolitan Life Ins. Co., 262 F. Supp. 3d 295, 316 (E.D.N.C. 2017).

Here, remanding the case would be a useless formality. Liberty's file

reviewers conducted a "full file review" of Plaintiff's medical records on four separate occasions. During these reviews, they considered multiple medical records from various treating physicians, psychiatrists, and psychotherapists. And during the final record review at the appeal stage, the DNCM considered Plaintiff's medical records spanning over a 14-month time period. While it is true that Liberty failed to contact Dr. Headen and request information from him regarding Plaintiff's treatment—despite Plaintiff's request to do so—the substantial weight of Plaintiff's medical records considered in Liberty's assessment and ultimate denial of Plaintiff's disability claim indicated that she was "disabled" as that term is defined in the Plan. Therefore, the "record already contains ample and reliable medical documentation." Elliott v. Sara Lee Corp., 190 F.3d 601, 609 (4th Cir. 1999). And as discussed *supra*, there is indicia that Liberty's conflict of interest influenced its decision-making process and conclusion. Accordingly, "a remand for further action is unnecessary here because the evidence clearly shows that [the ERISA plan administrator] abused its discretion." Weaver v. Phoenix Home Life Mut. Ins. Co., 990 F.2d 154, 159 (4th Cir. 1993). On this record, the Court declines to remand the case to Liberty and instead orders Liberty to reinstate Plaintiff's LTD benefits and any past due benefits according to the terms of the Plan. The Parties are ordered to submit supplemental briefing, per the instructions below, detailing the amount of benefits due to Plaintiff.

      2. Pre- and Post-Judgment Interest

      The parties have not submitted briefing regarding pre- and post-judgment interest, but the Court can nonetheless assess the merits since Plaintiff's

intent to seek interest was included in the Complaint. Awarding prejudgment interest is within the discretion of the trial court. <u>Montero</u>, 2016 WL 7444957, at *7. "The essential rationale for awarding prejudgment interest is to ensure that an injured party is fully compensated for its loss." <u>City of Milwaukee v. Cement Div., Nat'l Gypsum Co.</u>, 515 U.S. 189, 195 (1995). "[T]he governing principle is one of fairness." <u>Mary Helen Coal Corp. v. Hudson</u>, 235 F.3d 207, 211 (4th Cir. 2000) (internal quotation and citation omitted). "In determining the appropriate prejudgment interest rate, courts should look to the state statutory interest rate." <u>Montero</u>, 2016 WL 7444957, at *7. The interest rate in North Carolina is 8%. N.C. Gen. Stat. § 24-1. Additionally, "[u]nder federal law, post-judgment interest should be applied to 'any money judgment in a civil case recovered in a district court.'" <u>Stortz v. Cherokee Ins. Co.</u>, 2018 WL 1763523, at *4 (W.D.N.C. Apr. 12, 2018) (quoting 28 U.S.C. § 1961(a)).

Plaintiff has been deprived of LTD benefits due to her for almost two and a half years—since August 31, 2016. As was true in <u>Montero</u>, "[p]rinciples of fairness govern that Plaintiff be compensated for the 'loss of the use' of those funds, particularly in light of the intended purpose of LTD benefits." <u>Id.</u> at *8. Accordingly, the Court orders Defendants to pay 8% prejudgment interest, calculated simply, for past-due LTD payments. Additionally, Defendants shall pay post-judgment interest on Plaintiff's award, including interest on any amount of attorneys' fees and costs awarded to Plaintiff. <u>See</u> <u>Stortz</u>, 2018 WL 1763523, at *5.

### 3. Attorneys' Fees and Costs

ERISA provides for the discretionary award of attorneys' fees and

costs of action to parties who have "some degree of success on the merits." 29 U.S.C. § 1132(g)(1); Hardt v. Reliance Std. Life Ins. Co., 560 U.S. 242, 244 (2010) (quoting Ruckelshaus v. Sierra Club, 463 U.S. 680, 694 (1983)).  In the Fourth Circuit, if a party meets the initial requirement of "some degree of success on the merits," the following five-factor test governs its claim for attorneys' fees:

(1) degree of opposing parties' culpability or bad faith;
(2) ability of opposing parties to satisfy an award of attorneys' fees;
(3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances;
(4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and
(5) the relative merits of the parties' positions.

Williams v. Metropolitan Life Ins. Co., 609 F.3d 622, 645 (4th Cir. 2010) (quoting Quesinberry, 987 F.2d at 1029).

The parties do not provide much argument regarding the appropriateness of attorneys' fees and costs.  As such, Plaintiff is instructed to file a separate motion for attorneys' fees and costs, detailing the monetary amount sought and case law supporting her motion, as directed below.

IV.     CONCLUSION

IT, THEREFORE, IS ORDERED, that

1.  Plaintiff's Motion for Summary Judgment, (Doc. No. 25), is GRANTED;

2.  Defendant's Motion for Summary Judgment, (Doc. No. 23), is DENIED;

3.  Defendant's Motion to Strike, (Doc. No. 27), is DENIED as moot;

4.  Defendants shall fully reinstate Plaintiff's LTD benefits and pay any

and all past-due benefits;

5.   Plaintiff is entitled to prejudgment interest at the statutory rate of eight (8) percent.  Defendants shall also pay post-judgment interest on Plaintiff's award, including interest on any amount of attorneys' fees and costs awarded to Plaintiff; and

6.   Plaintiff is instructed to file a separate Motion for Attorneys' Fees within **seven (7) days** of this Order.  Defendant shall have **fourteen (14) days** from the submission of Plaintiff's brief to submit a responsive brief, and Plaintiff's reply shall be due **seven (7) days** from the submission of Defendant's response.

7.   Once the Court has ruled on the Motion for Attorneys' Fees, the parties shall attempt to submit a **joint pleading thirty (30) days** from the entry of that order detailing the exact dollar amount of reinstated benefits, past-due benefits, interest, and attorneys' fees owed to Plaintiff.  If the parties cannot agree to a joint pleading, Plaintiff's brief on the same subject is due **thirty (30) days** from the entry of this order, Defendants' response is due **fourteen (14) days** from the submission of Plaintiff's brief, and Plaintiff's reply is due **seven (7) days** from the submission of Defendants' response.

Signed: February 6, 2019

Robert J. Conrad, Jr.
United States District Judge